UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARLON MONTOYA,

          Plaintiff,

   v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY, et al.,

          Defendants.

Case No.  14-cv-02740-WHO

**ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 53, 64

Plaintiff Marlon Montoya appeals from the decision of Reliance Standard Life Insurance Company (Reliance) refusing to provide him long term disability ("LTD") benefits.  Because Reliance erred in limiting its physical IME to the June 26th 2012 date (and therefore ignored evidence of Montoya's worsening condition) and because Reliance erred in relying on out-of-date DOT occupational titles to determine the "fingering" requirements for someone who held Montoya's position, Montoya's motion for summary judgment is GRANTED and Reliance's motion is DENIED.

## BACKGROUND

### I.     THE LONG TERM DISABILITY PLAN

Through his employer, Montoya is a beneficiary of a long term disability insurance plan administered by defendant Reliance Standard Life Insurance Company ("Reliance").[1]  First Amended Complaint ("FAC") (Dkt. No. 32) ¶¶ 2–3; Defendants' Answer to FAC ("Ans.") (Dkt. No. 34)¶¶ 2-3; Administrative Record ("AR") 1.  The parties agree that the plan is covered by ERISA.  Reliance acts as a fiduciary of the plan, insures the plan, and determines disability benefits under the plan.  FAC ¶ 3; Ans. ¶ 3.  The Plan provides that a participant is "Totally

---

[1] The following facts are undisputed unless otherwise noted.

United States District Court
Northern District of California

Disabled" if, as a result of an injury or sickness:

> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period.
>> (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and
> (2) after a Monthly Benefit has been paid for 24 months, an insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

AR 9. Regular Occupation means "the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale." AR 8. Full-time means working "for a minimum of 30 hours during a person's regular work week." *Id*.

## II.     RELIANCE'S DETERMINATIONS

On April 20, 2013, Montoya filed a claim for long term disability benefits, describing his disabling conditions as carpal tunnel syndrome, pain in both hands, neck pain, back pain, acute stress reaction, and depression. AR 200–205. After reviewing his claim – including his medical records from Kaiser, a statement from his employer, his job description, and an analysis from a vocational rehabilitation specialist – Reliance concluded that Montoya had been disabled for a limited period, between June 26, 2012 through July 31, 2012, based on evidence of Montoya's psychiatric impairment of "acute stress reaction with co morbid occasional, bilateral fingering and handling." AR 169. It denied the claim for time after July 31, 2012, concluding that "medical records do not support moderate to severe psychiatric impairment that would preclude work function in another setting, such as a different employer or location. Moreover, the physical restrictions would remain." AR 169.

According to a Vocational Rehabilitation Specialist, Reliance determined that as of August 1, 2012, despite the ongoing physical limitations, Montoya could perform the duties and demands

of his "regular occupation." *Id*.[2]  Specifically, the Vocational Rehabilitation specialist compared the DOT occupational requirements of a "Caseworker" and a "Clinical Therapist" – which required occasional fingering and handling – and found that given Montoya's documented restrictions "his sole remaining restriction to occasional fingering and handling would directly match the occasional occupational requirements noted for those activities by the DOL."  AR 90-91, 115,134-135, 269-275.

Montoya appealed Reliance's decision (AR 656–58). As part of its review of the appeal, Reliance arranged for Montoya to undergo two independent medical examinations ("IMEs"), one psychological and one physical.  AR 1282–84.  Montoya appeared for the psychological IME – conducted by Dr. Mark Perl – on June 13, 2014, but did not attend the scheduled physical IME.

On June 16, 2014, Reliance upheld its initial denial of Montoya's claim with respect to his alleged physical disabilities, citing Montoya's failure to submit to the physical IME as a reason for denial.  AR 188–94.  Reliance indicated that it would address Montoya's claim with respect to psychiatric disabilities after it received the psychiatric IME.  AR 193.  On July 23, 2014, it denied Montoya's claim as to the psychological component of his asserted disability based on the results of the psychological IME, concluding that Montoya retained the ability to perform his occupation. AR 1452–57.

Montoya had initially refused to attend the physical IME, arguing that Reliance was not entitled to require one at the administrative appeals stage under ERISA.  March 2, 2015 Order (Dkt. No. 35).  In March 2015, I rejected that argument and denied defendant's motion for summary judgment for failure to exhaust.  I ordered a physical IME to be held as soon as practicable, and required Reliance to locate a physician for the IME who would allow plaintiff's counsel to be present.  *Id*. at 12.   After a scheduling mishap (Reliance provided the wrong address for the scheduled IME), in May 2015, I allowed the parties an additional 30 days to conduct the physical IME.  Based on plaintiff's request, I also ordered that the physician conducting the IME "shall consider" the August 28, 2014 medical report of Dr. Retodo, a physician retained by

---

[2] It appears that Reliance paid Montoya benefits from April through July 30, 2013.  AR 190-91.

United States District Court
Northern District of California

1   Montoya in connection with his worker's compensation claim.  May 7, 2015 Order (Dkt. No. 42).

2          After these delays, the physical IME finally took place with Dr. Donald Lee on July 13,

3   2015, with Montoya's counsel present.  AR 1562-1585.  On September 11, 2015, having both the

4   physical and psychological IMEs, Reliance upheld the decision to deny benefits.  AR 1663-69.

5   Reliance relied primarily on (i) the findings of Dr. Lee concluding that Montoya would be able to

6   perform his own occupation, (ii) its vocational assessment that Montoya's job was considered

7   "sedentary," and (iii) Montoya's statements to Dr. Lee about his capacity for household activities

8   and chores.  AR 1665-68.

9   **III.    MONTOYA'S ALLEGED DISABILITIES AND THE MEDICAL EVIDENCE**

10         Montoya argues that he became disabled as of June 26, 2012, when he fully stopped work

11  as a mental health therapist as the result of a stress related disability and physical ailments.  He

12  returned to work part-time, working five hours a day, around August 1, 2012 until September 26,

13  2012, when he quit work "primarily" due to pain, but with some "associated mental distress."  Pl.

14  Mot. [Dkt. No. 53] at 5-6.[3]

15     **A.  Psychiatric Issues**

16         Montoya asserts that his treating psychiatric records support a finding that he was disabled

17  – due to his depressed mood and affect – from June 2012 through January 2013.  AR 309, 319,

18  334, 337.   He contends that while some improvement was noted in January 2013, Dr. Navaez still

19  found significant limitations and difficult functioning.  AR 347-348.

20         Dr. Perl's July 3, 2014, IME report found Montoya improved but still diagnosed him with

21  "mild-to-moderate" depression and anxiety.  AR 1469.  Dr. Perl concluded that Montoya was

22  more "severely symptomatic" and suffered from major depression in spring and summer 2012 and

23  possibly until January 2013, but since that time his depression did not meet the criteria for major

24  depression and was diagnosed with "Depressive Disorder" and "Anxiety Disorder" not otherwise

25  specified.  AR 1469-70.  Dr. Perl concluded that Montoya was not "psychiatrically disabled from

26

27  [3] Montoya calculates the end of the ninety day Elimination Period required by the Policy as
    November 18, 2012, and the 24 month "Regular Occupation" period, during which he would be
28  disabled if he was unable to work in his regular occupation, as November 19, 2012 through
    November 18, 2014.  Pl. Mot. at 5.

performing his usual and customary job as a mental health therapist." AR 1468.

### B. Physical Issues

Montoya has suffered from neck and arm pain, radiating to the hand and right foot since 2010. AR 991. He also has longstanding carpel tunnel syndrome (CTS) issues. AR 361 (noting CTS diagnosis in September 2011). He sought treatment for his CTS from Kaiser in July 2012, but the medical records from that time period do not show that he suffered from a severe or disabling level of CTS. AR 387 (7/12/12 report, Montoya complaining of "worsening" numbness, had "known" CTS, nerve conduction studies showed "mild disease," reported no weakness and that physical therapy helped); AR 395 (8/15/12 report noting "generalized nerve pain on bilateral arms; not specific for carpel tunnel syndrome," no frank swelling, negative Phalen, Finkelstein, Tinel tests, finding upper limb tension on medial and ulnar nerves, finding a good prognosis for therapy and recommended treatment of heat, tissue mobilization, and stretches); AR 397-398 (8/31/2012 report noting better sensation, no acute distress, active trigger points on forearms, with continued conservative treatment).

In mid-October 2012 – after Montoya stopped working on September 29, 2012 – Montoya reported hand and wrist pain "for last 2 weeks, worse with working at the computer, difficulty cleaning dishes" despite doing his CTS exercises, but he denied any numbness or weakness. AR 409. The October 17, 2012 report found that Montoya had normal tendon function, and had positive Phelan and Finkelstein tests bilaterally. AR 410. Treatment involved continued exercises, wearing wrist braces, and further tests. *Id.* To treat his CTS and wrist and hand pain, Montoya had steroid injections in both wrists on October 22, 2012 and November 1, 2012. AR 413-414 (10/22/12 report noting Montoya complained of "progressive" episodes of pain, numbness, and tingling in right hand for past 6 months, mild relief with splints, positive Tinel and Phalen tests, negative Finkelstein test), AR 417-418 (11/01/12 report with same results). Ultimately, physicians at Kaiser performed a "surgical decompression" of the right median nerve on December 17, 2012 and on the left median nerve on January 7, 2013. AR 423-426, AR 427-428 (no significant pain following first decompression, and improvement in numbness), AR 429-432, AR 433-434 (doing well with return of sensation).

United States District Court
Northern District of California

Montoya's Kaiser's health insurance was terminated in February 2013, and on April 5, 2013, he was seen by Dr. Degamo from the NMCI clinic.  In April, 2013, Dr. Degamo noted Montoya's complaints of pain on both wrists and hands, self-rated 7 on a scale of 1-10. AR 864. He reported the pain worsened with typing, creating intermittent numbness of his entire hands, inability to hold items with force, bilateral shoulder pain occasionally, lower back pain worsened with sitting more than 20 minutes, and pain radiating to the right leg, knee, and foot. *Id*.  Dr. Degamo diagnosed cervical strain, bilateral carpel tunnel syndrome, lumbar strain and related back issues and prescribed chiropractic and acupuncture sessions for the CTS and cervical and lumbar strains, as well as naproxen, and topiramate.  *Id*.; *see also* AR 853-854.

In a May 14, 2013 report, Dr. Degamo recommended "continued conservative care" including topical cream and continued acupuncture and chiropractic visits.  AR 883.  In a report dated May 20, 2013, Dr. Degamo reported on Montoya's claim of "worsening pain" in his hands related to his CTS.  Dr. Degamo found decreased sensation to light touch and pinprick on bilateral thernar areas and positive Phalen's bilaterally.  AR 880.  Montoya was given refills for fluoxetine, naproxen, and topiramate and restricted to lifting no more than 15 pounds and limiting work to 4 hours per day, using wrist splints bilaterally.  *Id*.  She recommended modified duties from May through June 20, 2013.  AR 882.

On June 4 and June 20, 2013, Dr. Degamo filled out Attending Physician Statements, noting Montoya's complaints of hand/wrist pain which was worse with grasping objects.  The Phalens and Tinel tests were negative.  AR 895, 897.

In a July 15, 2013 Physician's Report, Dr. Degamo noted pain improvement on the hands, but still numbness and problems exacerbated by gripping/grasping objects, decreased sensation in both hands/wrists, decreased grip strength, and positive Phalen's.  AR 891.  On July 20, 2013 Montoya had an electrodiagnostic evaluation of his upper extremities to investigate his complaints of bilateral hand/wrist pain.  His hand/wrist strength was good, and the nerve conduction was normal except for "mildly prolonged" distal latency on the right and a "borderline" normal distal latency on the left.  AR 915.  However, the impressions from the study indicated left-side cervical radiculopathy involving the C5 and/or C6 nerve root, and evidence of mild CTS.  AR 916.

On August 11, 2103, Dr. Degamo completed a Work Status Form, recommending that Montoya have modified work duties from August 11 through September 11, 2013, with no repetitive typing or keyboarding and no lifting greater than 15 pounds.  Wrist splints were recommended for comfort.  AR 887.  On September 9, 2013 Dr. Degamo noted continued hand/wrist pain, worsened by typing for more than 15 minutes, and continued the recommendation for chiropractic treatment and prescription medications, and suggested a referral to a hand specialist.  AR 909.

In a September 19, 2013, QFCE Report to determine work restrictions, Dr. Degamo found Montoya able to lift up to 40 pounds, and able to do fingering, reaching, and handling "occasionally."  AR 846-849.  In an October 7, 2013 Primary Treating Physician's Progress report Dr. Degamo noted complaints of severe pain on right wrist and thumb, and continued to prescribe treatment of pain medications and chiropractic therapy, as well as a referral to a hand specialist. AR 901.  Dr. Degamo allowed for modified work from October 7 through November 11, 2013 with no lifting greater than 15 pounds, work up to four hours a day, 28 hours a week, no repetitive typing or keyboarding, and allowing wrist splints for comfort.  AR 902, 903.  In a November 26, 2013, Primary Treating Physician's Progress report Dr. Degamo noted continuing wrist/hand symptoms, and recommended a return to modified work on November 26, 2013, with up to four hours or work a day, 28 hours a week, and allowing wrist splints for comfort.  AR 1320.

Montoya saw Dr. Retodo on July 23, 2014, so that Dr. Retodo could perform a Panel Qualified Medical Evaluation.  Dr. Retodo issued his report on August 28, 2014.  AR 1509-1537. Dr. Retodo reviewed Montoya's medical records regarding his physical ailments, and noted that he currently complained of right wrist pain, which would increase at worst to 8/10 with washing dishes, cleaning, typing, and writing.  AR 1512.  It would improve at best to 4/10 with topical cream, wrist brace, tramadol, and rest.  *Id*.  Montoya also complained of low back pain, mid-back and neck pain that would substantially improve with medications and other treatment.  *Id*.

Dr. Retodo's medical exam in 2014 showed neurologic weakness and sensory loss in both hands, significant tenderness of the deQuervain's tendons in the right wrist, and significant decreased strength in the right hand.  AR 1533.  After reviewing the medical records and

1    performing his exam, Dr. Retodo diagnosed Montoya with: (i) cervical radiculopathy; (ii) bilateral

2    CTS with residual neuropathy across the wrist; (iii) right wrist internal derangement; and (iv) non-

3    industrial pre-existing lumbosacral spine injury and spina bifida occulta. AR 1531-1532. Dr.

4    Retodo concluded that Montoya sustained a "trauma" industrial injury while working at Westside

5    to his cervical spine and bilateral upper extremities. AR 1533.

6    Dr. Retodo concluded that Montoya was unable to return to his usual and customary job

7    duties and that he required a permanently modified or alternative job. AR 1535. He also

8    concluded that Montoya should have the following work restrictions: "No typing for greater than

9    twenty minutes per hour. No repetitive forceful gripping and grasping with the bilateral hands.

10   No repetitive bending or twisting of the neck." *Id*.[4]

11   On July 13, 2015, Montoya and his counsel appeared for the physical IME with Dr. Lee.

12   AR 1562. In his report of that same date, Dr. Lee summarized Montoya's medical history,

13   addressing both his psychiatric and physical ailments. AR 1562-1572. Dr. Lee noted that

14   Montoya currently complained of pain in both wrists/fingers radiating into his neck and low back,

15   right knee and right heel pain. AR 1573. That pain rated between 4/10 and 10/10 over the past

16   month. *Id*. The pain was precipitated by prolonged walking, climbing or lifting objects and doing

17   household chores. The pain was lessened by using wrist sprints, medications, and therapy

18   (physical therapy, chiropractic visits, acupuncture, and TENS). *Id*.

19   Montoya estimated that he had lost 10%-40% of various functions as of June 25, 2012,

20   including fingering, handling, pushing, pulling, reaching, sitting, and standing. AR 1575. He

21   reported only a slight moderate diminution in his ability to perform those activities, and that he is

22   able to perform all activities of daily living. *Id*.[5] In the physical examination, Dr. Lee noted that

23

24   [4] Dr. Retodo also suggested that Montoya could benefit from anti-inflammatory medicines, the use of resting wrist splints, injections, and further revision surgery. AR 1536.

25   [5] Montoya's counsel attended the Dr. Lee IME and makes a number of assertions about what Dr. Lee did or did not do during that exam. In particular, Montoya's counsel asserts that Dr. Lee (i)

26   advised Montoya that he would disregard any psychological component of Montoya's alleged impairments; (ii) did not ask any questions about Montoya's disability after June 26, 2012; and

27   (iii) did no tests, other than grip strength. Pl. Mot. at 12-13. Reliance objects to this "testimony" from Montoya's counsel as lacking foundation, hearsay, irrelevant, and calling for expert

28   testimony. Dkt. No. 65. Reliance's objections – which were filed in violation of Civ. L.R. 7-3(a)

United States District Court
Northern District of California

there was tenderness over both wrists with tapping over the carpel tunnel, a negative Phalen's test but a positive Finkelstein's test bilaterally (inflammation of tendons on the side of the wrist at the base of the thumb).  AR 1578.  He did not find any muscle atrophy and wrists and digits were normal to inspection.  He did find decreased grip strength in his right (dominant) hand.  *Id*. Finally he noted diminished sensation to pinprick and light in the "glove stocking distribution" of the right upper extremity compared to the left.  *Id*.

Dr. Lee characterized Montoya's treatment for his physical ailments as "conservative."  AR 1580.  In his report, Dr. Lee responded to several questions set out by Reliance regarding Montoya's conditions as of June 25 or June 26, 2012.[6]  Dr. Lee concluded that Montoya had several medical conditions as of those dates, including CTS and cervical/lumbar strain substantiated by medical documentation.  In response to question 4, which asked for a detailed explanation regarding the presence or absence of an impairment as of June 26, 2012, Dr. Lee responded that, based solely on his physical examination of Montoya, he disagreed with Dr. Retodo's limitations.  AR 1581-82.  Dr. Lee concluded that Montoya had a sedentary full-time work capacity – absent any psychiatric condition – as of June 26, 2012.  AR 1582.  In his Physical Capacities Questionnaire, Dr. Lee concluded that Montoya could use his upper right and left extremities for "frequently" or 34%-66% of the time for fine manipulation and reaching, pushing, and pulling.  AR 1585.

### C.  Montoya's Statement

In a January 9, 2014 statement, Montoya describes the physical illnesses that developed into physical limitations that he claims have prevented him from working and from performing daily life activities.  AR 1274-75.  Montoya asserts that he is unable to do many basic life activities (washing dishes and vacuuming) and experiences pain doing simple things (brushing teeth, showering, and tying shoe laces) because of pain in his neck, shoulders, low back, and

---

– are overruled for purposes of determining these cross-motions.  However, I do not need to consider or rely on those assertions for purposes of ruling on these motions.

[6] Reliance variously refers to the date it wanted Dr. Lee to assess Montoya's impairments as June 25 or June 26, 2012.  AR 1582.  For simplicity, I will refer to the date of inquiry as June 26, 2012.

particularly in his hands.  AR 1274.  He claims he cannot stand for more than 30-45 minutes or sit

for more than an hour because of back, bottom, heel, and knee pain.  *Id*.  He asserts the carpel

tunnel operations on his hands in late 2012 and early 2013 were unsuccessful and that he

continues to have worsening symptoms and cannot type for more than a few minutes.  *Id*.

Montoya also comments, briefly, on his mental health issues of depression and anxiety that

cause him to have good days and bad days.  *Id*.  He asserts that his mental health issues combined

with his physical limitations prevent him from "concentrating and keeping focus on job activities

and thoughts to complete tasks." *Id*.

## LEGAL STANDARD

Under Section 502 of the Employee Retirement Income Security Act ("ERISA"), a

beneficiary or plan participant may sue in federal court "to recover benefits due to him under the

terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  A claim of denial of benefits in

an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the

[plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

When the plan grants the plan administrator discretion to determine eligibility for benefits

or to construe the terms of the plan, then a court may only review the administrator's decision

regarding benefits for an abuse of discretion.  *Id*.  A court "can set aside the administrator's

discretionary determination only when it is arbitrary and capricious."[7]  *Jordan v. Northrop*

*Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004).  In such a situation, "a

motion for summary judgment is merely the conduit to bring the legal question before the district

court and the usual tests of summary judgment, such as whether a genuine dispute of material fact

exists, do not apply."  *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 706 (9th Cir. 2012).[8]

---

[7] Courts sometimes refer to the abuse-of-discretion standard interchangeably with "arbitrary and capricious."  The Ninth Circuit has made clear that there is no substantive difference.  *Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir. 1996), o*verruled on other grounds by Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999).

[8] If "the same entity that funds an ERISA benefits plan also evaluates claims . . . the plan

If the plan does not grant the administrator discretion to determine benefits, then review of the administrator's decision is conducted under the *de novo* standard. *Firestone Tire & Rubber Co.*, 489 U.S. at 115. Under the *de novo* standard, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). The normal summary judgment standard applies under *de novo* review. *See Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).

## DISCUSSION

## I.     STANDARD OF REVIEW

The parties dispute which standard applies to my review of Reliance's determination; *de novo* or abuse of discretion. Montoya points out that Reliance's policy reserves discretionary authority, and that accordingly California Insurance Code section 10110.6 applies. It provides:

> If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

Courts in this district have applied section 10110.6, refusing to enforce "discretionary" clauses in long term disability cases and instead applying the *de novo* standard of review. *See, e.g., Hirschkron v. Principal Life Ins. Co.*, No. 15-cv-00664-JD, 2015 U.S. Dist. LEXIS 147685, at *8 (N.D. Cal. Oct. 29, 2015); *Rapolla v. Waste Mgmt. Emple. Benefits Plan*, No. 13-cv-02860-JST, 2014 U.S. Dist. LEXIS 87256, at *21 (N.D. Cal. June 25, 2014).

Reliance argues that by alleging in his complaint that Reliance abused its discretion in denying benefits to Montoya, and by seeking discovery to uncover whether Reliance suffered from

---

administrator faces a structural conflict of interest: since it is also the insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the administrator retains money for itself." *Montour*, 588 F.3d at 630. Where such a conflict of interest is alleged and the administrator has discretion to decide eligibility for benefits, the abuse-of-discretion standard still applies and the alleged conflict is but one factor in the analysis, with appropriate weight given to the administrator's determination depending upon the seriousness of the alleged conflict. *Id.* at 631. "[A] higher degree of skepticism is appropriate where the administrator has a conflict of interest." *Salomaa*, 642 F.3d at 676

United States District Court
Northern District of California

United States District Court
Northern District of California

bias or a structural conflict in making its benefits determination (relevant to whether a "skeptical" abuse of discretion standard might apply), the "law of the case" establishes that an abuse of discretion standard applies. Reliance Oppo. at 9-12. This lacks merit. None of my prior Orders determined which standard I would apply in reviewing Reliance's determination. By allowing Montoya to conduct limited discovery on whether Reliance suffered from bias or a conflict of interest such that a skeptical abuse of discretion could be the standard, I did not determine that an abuse of discretion standard would apply.

Reliance asserts that it would be inequitable to allow a Montoya to seek discovery and then nonetheless apply a *de novo* standard. But Reliance failed to respond to Montoya's point that while Montoya sought extensive discovery regarding bias and conflict of interest, the only substantive response Reliance provided was the production of portions of Reliance's Administrative Procedures Manual. *Compare* Reliance Reply (Dkt. No. 72) at 1-2; *with* Montoya Reply (Dkt. No. 70) at 2; *see also* Declaration of Dennis Rhodes, Dkt. No. 64-2, Exs. 7-8. Reliance does not persuasively address the applicability of California Insurance Code section 11010.6, enacted on January 1, 2012, which bans "discretionary clauses" like the one in Reliance's Policy.

I reject Reliance's equitable argument. Insurance Code section 11010.6 applies to this case, and so does a *de novo* standard of review.

## II.    RELIANCE'S DETERMINATION UNDER "STANDARD OCCUPATION"

Montoya argues that Reliance incorrectly denied him benefits because: (i) the plan never adequately considered the combination of his physical and psychological impairments; (ii) Dr. Lee – who conducted the physical IME – erred in multiple ways, including by focusing on whether Montoya was disabled only as of June 26, 2012; and (iii) Montoya's own occupation required typing more than 20 minutes an hour, which medical evidence suggests he cannot do.

### A.  Consideration of Combination of Physical and Psychological Impairments

Montoya argues that Reliance erred because its medical examiners failed to consider the combination of physical impairments and the resulting psychological impact of his chronic pain,

United States District Court
Northern District of California

1   which caused his depression and anxiety.  Pl. Mot. at 6-16-17; Pl. Reply 11-12.  He also argues

2   that Reliance's medical examiners and Reliance erred because no one considered whether a mental

3   health therapist could work with patients while still suffering from his own depression.  Pl. Mot. at

4   6, 17.

5          To support this argument, Montoya cites no medical evidence in the record that he claims

6   Reliance ignored or that would otherwise support his theory.  Instead, he relies on an article he

7   submitted to Reliance as part of his appeal of the LTD benefits denial.  AR 659-662 ("Depression

8   and Pain," Harvard Health Publications).  He points out that Dr. Perl recognized the relatedness of

9   these issues in his report, noting that "the claimant's mood and subjective psychiatric symptoms

10  will depend to some degree on the progress of his physical symptoms.  Leaving aside his wrist

11  problems, however, it is likely that his depression and anxiety would resolve."  AR 1470.  Dr.

12  Perl's report is likewise full of references to Montoya's physical ailments and pain complaints.

13  AR 1465-67.  Contrary to Montoya's argument, Dr. Perl considered the impact of Montoya's

14  physical ailments and pain on his psychiatric functioning and overall prognosis.

15         The evidence in the record supports Reliance's determination that Montoya's depression

16  and anxiety – which Reliance determined was disabling for the limited period of July 26, 2012

17  through July 31, 2012 – was situational and related to his work at Westside Community Services.

18  *See, e.g.,* AR 393-394 (Karin Heller LCSW); AR 307, 336-37 (Vander Clute LCSW); AR 327,

19  332-333 (Li MFT); AR 340, 343-344 (Dr. Navaez); AR 379, 406 (Kurien); AR 1461-62, 1469

20  (Dr. Perl).  Reliance found – and Montoya points to no evidence in the record to the contrary –

21  that following August 1, 2012, Montoya did not have a psychiatric condition that would have

22  disabled him from performing "his occupation."  While Dr. Perl noted that Montoya's ongoing

23  "mild-to-moderate" depression and anxiety was related in part to his physical ailments, there is no

24  evidence that the "mild-to-moderate" depression was disabling.[9]

25         Reliance did not fail to appropriately consider the combination of Montoya's physical and

26  psychiatric impairments, and did not err in finding that Montoya was not psychiatrically disabled

27

28  [9] Indeed, as Dr. Perl noted in 2014, the claimant was not in active psychiatric treatment and was taking a "minimal" and "subtherapeutic" amount of Prozac.  AR 1470.

United States District Court
Northern District of California

on and after August 1, 2012.

### B.  Dr. Lee's Determination

Montoya makes several arguments that Reliance erred in relying on the IME report of Dr. Lee, who found that he was not prevented from performing his "own occupation" by his physical ailments.

#### 1.  Date of Disability

Montoya first argues that Reliance could not rely on Dr. Lee's determination because Dr. Lee opined only on whether Montoya was disabled as a result of physical ailments as of June 26, 2012.  Pl. Reply at 4-7.  Montoya notes that Reliance had already accepted that he was disabled at that time and asserts that Dr. Lee's failure to ask about his condition on any other date fatally limited his report.  Pl. Mot. at 13; Pl. Reply. Br. at 4-7.  Montoya also contends that by limiting the analysis to June 26, Dr. Lee impermissibly neglected evidence showing that Montoya's CTS worsened dramatically from October 22 through November 13, 2012.  Pl. Reply at 6-7.

Montoya's first argument is without merit.  While Reliance agreed that as of June 26, 2012, Montoya was disabled, a close reading of Reliance's June 18, 2013 letter shows that Reliance determined Montoya was disabled *primarily* because of his psychiatric conditions and only secondarily because of his physical ailments.  It explained that his disability was only found through July 31, 2012, because after that date the medical records do not support a moderate to severe psychiatric impairment.  Moreover, he was found not to be disabled after that date, despite "the physical restrictions" remaining.  AR 169.

I agree with Montoya's second argument. Reliance improperly ignored the worsening of his CTS as shown by his treatment records. Reliance contends that it was fully appropriate to focus on Montoya's own alleged date of onset – June 26, 2012 – which is the date Montoya and his doctor's note as the date of onset in their reports.  AR 200, AR 204, AR 215, AR 238.   It asserts that "any developments subsequent to the date of onset are immaterial."  Reliance Reply at 9.   But it failed to explain why it was appropriate to limit its review of Montoya's physical ailments to June 26, 2012 when the record is replete with evidence that Montoya's upper extremity pain worsened significantly very shortly after that time.

Following oral argument, the parties were invited to provide supplemental authority addressing whether Reliance appropriately limited the physical IME to determine Montoya's physical impairments as of June 26, 2012 (as neither side had provided any case law on this point in their summary judgment briefing). Reliance cited three cases, none of which are apposite.[10] *See Govrik v. Unum Life Ins. Co. of Am.*, 702 F.3d 1103, 1109 (8th Cir. 2013) (concluding it was not an abuse of discretion for a plan administrator to determine Montoya's income was due to the sale of a business as Montoya had represented to the Social Security Agency, as opposed to a latter-day claim that the income was salary); *Jacobs v. Unum Life Ins. Co. of Am.*, No. 3:04cv1034, 2006 U.S. Dist. LEXIS 10567, at *36 (M.D. Tenn. Feb. 21, 2006) (rejecting Montoya's argument that insurer was required to gather additional evidence because it "is not a violation of ERISAs claims procedures for a plan administrator, such as UNUM, to rely on the information provided by [Montoya] in deciding her claim."); *Keough v. Liberty Life Assur. Co*, 2005 U.S. Dist. LEXIS 2815 *4 (D. N.H. Feb. 24, 2005) ("It was also reasonable for Liberty Life to rely on the information Keough provided in her Activities questionnaire in which she indicated that she spends approximately 12 hours a day sitting, albeit with a lot of stretching.").

The question is not whether Reliance erred in considering Montoya's physical limitations as of June 26, 2012. That is the date Montoya alleges as onset and it was a date when Reliance found Montoya to be disabled as a result of his combined mental and physical ailments and is clearly relevant. The question is whether Reliance's *limiting* Dr. Lee to determining Montoya's physical limitations as of June 26, 2012 was unreasonable under a *de novo* standard in light of the substantial evidence in the record – including evidence from Dr. Retodo that I ordered Dr. Lee to consider – that Montoya's limitations deteriorated soon after. In absence of authorities allowing Reliance to limit its IME in the manner it did (and, therefore, ignore the subsequent evidence), Reliance erred in relying on Dr. Lee's report to deny Montoya's claim for benefits.

### 2. Functional Capacity

Relatedly, Montoya argues that Dr. Lee's determination as to Montoya's impairments as of

---

[10] Montoya did not submit any supplemental authority.

United States District Court
Northern District of California

June 26, 2012 – Dr. Lee's response to question 4, AR 1581 – is not supported on its face. Montoya points out that the question Dr. Lee answered was: "Please provide a detailed explanation regarding presence of absence of impairment as of 6/26/12.  Please include references to medical records included in your review.  Report must include the basis of your opinion."  In response, Dr. Lee disputed Dr. Retodo's conclusions that Montoya had functional work restrictions of "no typing greater than 20 minutes per hour.  No repetitive forceful gripping and grasping with bilateral hands.  No repetitive bending or twisting of the neck."  AR 1581-82.  Dr. Lee concluded that "based on the physical exam, in my opinion, the patient has ability with frequently perform simple grasping and fine manipulation."  AR 1581.  In the attached, Physical Capacities Questionnaire, Dr. Lee indicated that with respect to his upper extremities, Montoya had ability to frequently use his upper extremities to push, pull, reach, and engage in fine manipulation.  AR 1585.

In reaching these determinations, Dr. Lee did not discuss the medical records prior to or after June 26, 2012.  He relied *only* on his examination that took place in 2015, and did not explain why, based on his 2015 examination, he could testify to what Montoya's limitations were in 2012.[11]  In oral argument, Reliance argued that it can be assumed that Dr. Lee took into account the medical records he identified at the beginning of his report in formulating his answers to the questions about whether Montoya was disabled on June 26, 2012, but there is nothing in Dr. Lee's report that supports the assumption.  Dr. Lee did not identify *any* medical records that supported his conclusions and disagreement with Dr. Retodo.  *Id.*  Under the *de novo* standard, Reliance erred in relying on Dr. Lee's assessment of Montoya's functional capacity as of July 2015 to determine Montoya's claim for benefits.

---

[11]  While Reliance complains that the IME would have taken place earlier but for the interference of Montoya's counsel and Montoya's counsel's insistence on attending the IME, the earliest the IME could have taken place was February 2014.  Reliance is correct that Dr. Retodo made a determination that Montoya suffered "cumulative trauma injuries" in the period of June 26, 2011 *through June 26, 2012*.  AR 1535-1536.  However, as part of his analysis of Montoya's limitations, Dr. Retodo reviewed and discussed the medical evidence preceding *and* post-dating June 2012.  Dr. Retodo did not limit himself to relying on the medical evidence as of June 26, 2012.

### 3.  Dr. Lee's Professional Veracity/Qualifications

Montoya challenges Dr. Lee's veracity and his qualifications to perform the IME in order to argue that Reliance erred in relying on it.  Pl. Mot. at 14; Pl. Reply at 12.  He argues that because Dr. Lee advertises his business on the internet as BIZ MEDSPA and offers cosmetic and skin care products and treatments, but does not disclose this on his CV, his CV is neither accurate nor truthful.  Pl. Mot. at 14; Pl. Reply at 12.

Initially, the information relied on by Montoya is not only outside of the Administrative Record but is not submitted by declaration or otherwise substantiated outside of the assertions in Montoya's briefs.  It is also irrelevant.  That Dr. Lee works in another field does not undermine the veracity of his CV or his qualifications; he has worked as an occupational health doctor since the early 1980s and been a Qualified Medical Examiner and Agreed Medical Examiner since 1991.  AR 1587-92.

### 4.  Failure to Consider Dr. Retodo's Report

Montoya appears to argue that despite my May 7, 2015 Order – directing Reliance to have the physician conducting the physical IME consider the August 28, 2014 report of Dr. Retodo – Dr. Lee failed to adequately consider Dr. Retodo's report.  Pl. Mot. at 13-14.  He also complains that Reliance failed to include a copy of Dr. Retodo's Report in the Administrative Record.  Pl. Mot. at 9-10.  As a result, Montoya filed a copy of Dr. Retodo's August 28th Report and a "supplemental report" from Dr. Retodo dated November 5, 2015, along with his motion for summary judgment.  Dkt. Nos. 54-1, 55.  Montoya relies on the Supplemental Report from Dr. Retodo to further support his arguments that Dr. Lee and Reliance were wrong about his physical ailments.

With respect to the first issue, while it appears that Dr. Lee did not have (or did not know he had) Dr. Retodo's report in his possession prior to the start of the IME, Dr. Lee definitely possessed a copy of it before the end of the IME.  AR 1596-1598 (Padway letter regarding efforts to bring Dr. Retodo's report to the attention of Dr. Lee).  More importantly, Dr. Lee considered Dr. Retodo's August 28, 2014 Report.  Dr. Lee expressly discussed it and disagreed with some of

United States District Court
Northern District of California

1   Dr. Retodo's findings in his IME Report.  *See* AR at 1573, 1581-82.[12]

2          With respect to Montoya's November 5, 2015 "supplemental report" from Dr. Retodo, that

3   report is outside the Administrative Record and I will not consider it.  Montoya argues that he

4   should be allowed to supplement the record and introduce the November 5, 2015 report because

5   Reliance used Dr. Lee's report to affirm the denial of benefits to Montoya without giving Montoya

6   the opportunity to review and rebut that report prior to Reliance reaching its final administrative

7   determination.  Pl. Mot. at 11.

8          As I explained in my March 10, 2015 Order, while a benefits provider is not required

9   under ERISA to share with a claimant the medical reports it secures while the claim is on appeal

10  before reaching a final decision, the cases "leave open the possibility that if the plan uses an IME

11  (or peer reviews) to create a wholly new reason to deny a claim — in order to bait and switch the

12  claimant — then a violation of ERISA's procedural protections may have occurred."  March 10,

13  2015 Order (Dkt. No. 36) at 8.

14         Here, there is no evidence of a "bait and switch."  Reliance's explanations for denying

15  benefits to Montoya have remained consistent from June 18, 2013 to date.  There are no grounds

16  to allow Montoya to expand the record with Dr. Retodo's November 5, 2015 Report.[13]

17      **C.  Montoya's Regular Occupation**

18         Finally, Montoya argues that Reliance erred – even if it accepted Dr. Lee's version of

19  Montoya's limitation – in determining that Montoya's "regular occupation" required so little

20  typing/fingering.  Reliance should have, he asserts, considered his actual job tasks as a mental

21  health therapist at Westside Community Services, which required substantial typing/fingering that

22  he is not able to perform.  He notes that his former employer (Westside) described his job as

23  requiring computer use 40% of the time.  AR 199.  Dr. Lee acknowledges that Montoya reported

24  _____

25  [12] Reliance included a copy of Dr. Retodo's August 28, 2014 Report in its Supplemental
    Administrative Record.  AR 1509-1537.

26  [13] Relatedly, it appears that Montoya is also arguing that Dr. Lee's Report is undermined – or that

27  Reliance violated the procedural protections of ERISA – because Reliance and Dr. Lee did not
    disclose to Montoya the questions Reliance asked Dr. Lee to answer *prior* to the IME.  Pl. Br. at
    12; Pl. Reply at 4-5.  Montoya cites no cases or provisions in ERISA that would require Reliance

28  to disclose its IME questions in advance of the IME to a plaintiff.

1    that computer use amounted to 60% of his time on a typical day.  AR 1563; *see also* AR 1510 (Dr.

2    Retodo reporting that Montoya spent approximately four hours a day on the computer, and two

3    hours handwriting paperwork).

4         In denying benefits, Reliance cited to the DOT title for "Caseworker/Social Services" and

5    "Clinical Therapist" to conclude that Montoya's job required only "occasional" fingering and

6    "lifting, carrying, pushing, pulling 10 lbs. occasionally."  AR 269-275.  Reliance argues that its

7    consideration of DOT titles for "general job" requirements is appropriate and that it need not look

8    at the specific job duties of a specific employee at a specific employer.  Reliance Oppo. at 19.  It

9    also points out that the Policy defined "regular occupation" as how that job "is normally

10   performed in the national economy, and not the unique duties performed for a specific employer or

11   in a specific locale."  AR 8.

12        Montoya argues that Reliance should not be able to rely on a DOT title that was last

13   updated in 1981 (Caseworker) for determination of what an occupation entails today in terms of

14   "fingering" and computer work.  Mot. 15; AR 270.[14]  He asserts instead that Reliance should have

15   relied on his testimony about his actual work demands or, at a very minimum, the description from

16   Westside that his job required computer work at least 40% of the time, significantly more than the

17   "occasional" fingering allowed by Dr. Retodo.

18        At oral argument, Reliance acknowledged that there has been criticism of the DOT given

19   the fact that demands of many jobs have changed in recent years (and the DOT has not been

20   updated since 1991), but said its past and current use of those titles was appropriate.[15]  I invited

21   the parties to submit supplemental authority on this point.  Reliance cited four cases, but again

22   none of them are apposite.[16]  *Gallagher v. Reliance Std. Life Ins. Co*., 305 F.3d 264, 272-73 (4th

23   Cir. 2002) (affirming denial of benefits under *de novo* review where Montoya failed "to point to

24   any specific duty in the DOT description that was in some way different from his actual job

25   _____

26   [14] It appears that the DOT title for Clinical Therapist was last updated in 1989.  AR 273.

27   [15] In its summary judgment briefing, Reliance cited a few cases on this question that apply the
     abuse of discretion standard of review.

28   [16] Montoya did not submit supplemental authority.

United States District Court
Northern District of California

duties" and so job description used by Reliance was "objectively reasonable."); *Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929, 936 (8th Cir. 2010) (affirming reliance on DOT under abuse of discretion standard, where it was "reasonable to apply" the DOT description in that case and the DOT description "of the occupation is largely consistent with evidence of the duties that [Montoya] actually performed for [defendant]."); *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006) (affirming reliance on DOT in case decided under abuse of discretion where "the policy contemplates that Hartford will have broad discretion in determining what is an employee's 'own occupation'"); *Dionida v. Reliance Std. Life Ins. Co.*, 50 F. Supp. 2d 934, 939 n.4 (N.D. Cal. 1999) (reversing Reliance's determination, but concluding, as to a determination made 1994, "[g]iven the amount of research and analysis that has gone into grouping similar jobs and defining the occupational titles, and the length of time the D.O.T. has been widely used, it is reasonable for plan administrators, and courts, to use it for determining a claimant's "'regular occupation."").

I find that it was unreasonable to rely solely on the DOT definitions (last updated in 1991 or earlier) to determine the appropriate level of "fingering" required by someone performing Montoya's "regular occupation" in 2012, particularly given the evidence of record.

## III.   REMEDY

Having concluded the Reliance erred and acted unreasonably under the *de novo* standard of review, the determination of the appropriate remedy remains. Neither side adequately addressed this issue in their briefs or at oral argument. Montoya contended that if he prevailed on summary judgment, the parties would need to meet and confer to determine how much he would be entitled to under the two-year "own occupation" policy given conflicting evidence in the record about how many payments he had already received, and remand the case for a determination of whether Montoya was entitled to benefits under the "any occupation" standard. *See* Reply [Dkt. No. 70] at 13. Reliance responded that since its determination was correct, no award of benefits or remand was required. Reply [Dkt. No. 72] at 10.

Within 20 days of the date of this Order, Montoya and Reliance shall meet and confer on a proposed form of judgment. If the parties cannot agree on the form that judgment should take,

United States District Court
Northern District of California

they shall file briefs (not to exceed 10 pages each) justifying their competing proposals.  The briefs shall be filed within 45 days of the date of this Order.

**CONCLUSION**

For the foregoing reasons, Montoya's motion for summary judgment is GRANTED and Reliance's is DENIED.

**IT IS SO ORDERED**.

Dated: September 27, 2016



WILLIAM H. ORRICK
United States District Judge